**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MATT DINERSTEIN, individually and on behalf of all others similarly situated,<br><br>   *Plaintiff*,<br> v.<br><br>GOOGLE LLC, a Delaware limited liability company, and THE UNIVERSITY OF CHICAGO MEDICAL CENTER, an Illinois not-for-profit corporation, THE UNIVERSITY OF CHICAGO, an Illinois not-for-profit corporation,<br><br>   Defendants. | Case No. 1:19-cv-04311<br><br>Hon. Rebecca R. Pallmeyer |

**DEFENDANT GOOGLE LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY IN SUPPORT OF GOOGLE'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT
(FED. R. CIV. P. 12(b)(1) AND 12(b)(6))**

I. **INTRODUCTION**

Plaintiff's Opposition ("Opposition" or "Opp.") to Defendants' Motions to Dismiss offers no valid justification for the many defects of the Amended Complaint ("Amended Complaint" or "AC") and is more notable for what it concedes than what it attempts to refute.

*First*, with respect to the issue of Article III standing, Plaintiff tacitly concedes that Google has never attempted to "re-identify" him, or anyone else, from the University's research data. Indeed, Google confirmed in the Data Use Agreement ("DUA") governing its use of the research data that it would not do so. Plaintiff therefore lacks standing to pursue a claim against Google, because Google's receipt of data that is not tied to specific individuals is not an invasion of privacy and there is no imminent risk of harm to support a cognizable injury.

*Second*, Plaintiff points to no facts in the Amended Complaint to support the element of "intentional and malicious inducement" needed to state a claim for intentional interference with contract. Plaintiff's only response on this issue is to cite a case that actually affirmed dismissal of an interference claim for failure to allege wrongful intent—precisely the same defect that mandates dismissal here.

*Third*, with respect to the theory that Google induced the University to violate HIPAA, Plaintiff concedes that HIPAA includes multiple safe harbors that allow covered entities like the University to disclose research data without patient authorization, and even pleads facts indicating compliance. Given these statutory safe harbors, Plaintiff cannot demonstrate a HIPAA violation by merely alleging, as he does, that research data was disclosed without his authorization. Plaintiff tries to obscure this defect in various ways, but none has merit.

*Fourth*, Plaintiff claims that Google induced the University to breach an "all efforts" clause in its patient agreements and to violate an Illinois statute involving experimental procedures and research programs. But Plaintiff neglects to mention that the "all efforts" clause

1.

on which he relies is part of an agreement in which patients specifically authorize the University to share data for research purposes. Plaintiff's theory based on the Medical Patients Rights Act ("MPRA") fares no better, as the statute only applies to procedures and research that could pose some risk to current patients. Plaintiff's effort to expand the statute to cover Google's data analysis requires a tortured reading of the statute that should be rejected.

*Fifth*, Plaintiff offers no reason whatsoever why his defective claim for intrusion upon seclusion should be allowed to proceed. Instead, Plaintiff asks the Court to create an entirely new cause of action—for "unauthorized disclosure by a medical provider of patients' medical information" (Opp. at 24)—that he concedes has never been recognized under Illinois law. The Court should reject this request, which would violate the Seventh Circuit's clear admonition that federal courts not create new state law. Further, even where the tort has been recognized, courts have applied it only where the medical information at issue is tied to identified individuals, which was not the case with the research data here.

In short, all claims against Google should be dismissed with prejudice.

**II.    ARGUMENT**

    **A.    Plaintiff Lacks Article III Standing (All Counts).**

As Google showed in its Motion to Dismiss ("Motion" or "Mot."), Plaintiff's theory of a purported "injury in fact" against Google—that Google could potentially try to "re-identify" him from the University's research data by combining it with other data—is inherently speculative and cannot support Article III standing. (Mot. at 5-6.) In his Opposition, Plaintiff does not dispute that Google has never tried to re-identify him (or anyone else) and thus knows nothing about his medical treatments or conditions (or anyone else's). Instead, Plaintiff claims that the mere disclosure of research data to Google constitutes an "invasion of privacy" that supports

2.

Article III standing even without such re-identification.[1] (Opp. at 6-9.) Plaintiff's own legal authorities do not support this theory of injury.

Plaintiff relies on *Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688 (7th Cir. 2015) and *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963 (7th Cir. 2016), both of which involved data breaches in which hackers obtained consumers' credit card information. The courts there found that plaintiffs "should not have to wait until hackers commit identity theft or credit-card fraud" to bring suit because "everyone's personal data has already been stolen" and "there is an 'objectively reasonable likelihood' that such injury will occur." *Remijas*, 794 F.3d at 692-93 (citation omitted); *see also Lewert*, 819 F.3d at 967 ("[i]t is plausible to infer a substantial risk of harm from the data breach, because a primary incentive for hackers is 'sooner or later[ ] to make fraudulent charges or assume those consumers' identities") (citation omitted).

Further, in addition to the likelihood of future harm, the courts found that plaintiffs in these cases faced immediate "identifiable costs associated with the process of sorting things out," including "replacing cards and monitoring their credit score," *Remijas*, 794 F.3d at 692, regardless of what the hackers eventually did with their data. *See also Lewert* 819 F.3d at 967 (the fact that a data breach occurred "made the risk of identity theft and fraudulent charges sufficiently immediate to justify mitigation efforts," which "qualify as 'actual injuries'") (citations omitted). In *Remijas* and *Lewert*, the disclosure of the personal data—without more—

---

[1] Plaintiff additionally argues that he has standing to pursue his claims against the University by virtue of the University's alleged breach of contract and "conversion of the commercial value of [his] information . . . ." (*See* Opp. at 4-5, 9.) Given that neither of these theories implicates Google, Google does not address them here, except to note that Plaintiff has failed to plausibly allege breach (*see* Mot. at 6-9) and has not pled facts demonstrating that, by sharing data pursuant to HIPAA, the University caused Plaintiff to lose anything of value. *See Silha v. ACT, Inc.*, 807 F.3d 169, 174-75 (7th Cir. 2015) (plaintiff lacks standing because "a plaintiff's claim of injury in fact cannot be based solely on a defendant's gain; it must be based on a plaintiff's loss").

3.

thus created "certainly impending" risk that required redress, *Remijas*, 794 F.3d at 692 (citations omitted); no additional steps were necessary to cause harm.

The circumstances here are not remotely similar. The data at issue was not stolen by hackers who are now free to use the data as they wish for nefarious purposes. It was shared pursuant to a HIPAA-compliant DUA that contractually limits Google's uses and specifically forbids any effort to re-identify patients. (AC Ex. 1 at § 3.1(b) ("Data User agrees not to use the Limited Data Set in [] a way as to identify any individual and further agrees not to contact any individual.").) This case thus raises none of the imminent and actual harms that supported standing in Plaintiff's cited cases.

The circumstances here are also readily distinguishable from those in which courts have found standing based on an established invasion of privacy under Illinois law, all of which involve the exposure of personal information tied to specific individuals. *Cf. Sterk v. Redbox Automated Retail, LLC*, No. 11-cv-1729, 2013 WL 4451223, at *1, *3 (N.D. Ill. Aug. 16, 2013), *aff'd*, 770 F.3d 618, 628 (7th Cir. 2014) (plaintiffs have standing based on alleged violation of privacy rights where defendant disclosed plaintiffs' PII, defined as "information which *identifies a person* . . . ," and including plaintiffs' names, emails, zip codes, and the last four digits of their credit card numbers) (emphasis added); *Browner v. Am. Eagle Bank*, 355 F. Supp. 3d 731, 732 (N.D. Ill. 2019) (finding an "invasion of privacy" sufficient to establish Article III standing where defendant impermissibly accessed plaintiff's "individual and personal credit file," obtaining "personal information about plaintiff, including her current and past addresses, birthdate, employment history, and telephone numbers," as well as her "payment history, [information about her] individual credit accounts, and credit worthiness."). The research data at issue here raises no such issues because it is not tied to individually identified patients.

The Court should reject Plaintiff's effort to expand the scope of Article III injury in a way that has no legal support and would only hamstring legitimate medical research authorized by HIPAA. *See* 45 C.F.R. §§ 164.512(i)(1)(i); 164.514(e).

### B. The Court Should Dismiss Plaintiff's Intentional Interference with Contract Claim (Count 4).

#### 1. Plaintiff alleges no facts to show that Google acted with the wrongful intent needed to support an intentional interference claim.

As shown in Google's Motion, Plaintiff's claim for intentional interference with contract fails because the Amended Complaint does not demonstrate any contractual breach by the University. (*See* Mot. at 6-9; ECF No. 44 (University's Motion to Dismiss) at 9-11.) But even if Plaintiff had demonstrated a breach, the claim would still fail because the Amended Complaint is devoid of any facts to show that Google's "intentional and malicious inducement" caused any alleged breach. *George A. Fuller Co., Div. Northrop Corp., v. Chi. Coll. of Osteopathic Med.*, 719 F.2d 1326, 1330 (7th Cir. 1983) (internal quotation and citations omitted).

Plaintiff's Opposition makes little effort to address Google's arguments on this point, suggesting in a footnote that the requirement of intentional conduct only applies where the conduct would otherwise be "privileged." (Opp. at 11.) But the case on which Plaintiff relies says no such thing[2] and actually *affirmed dismissal* of an interference claim because plaintiff did not adequately allege that the defendant "*intentionally* caused" the breach or "*intended* to cause [plaintiff's] harm." *Ill. Bell*, 778 N.E. 2d at 1211 (emphasis in original). Plaintiff's allegations here fall short for the same reasons.

---

[2] In fact, it explicitly rejects the theory that "the element of intentionality [should be limited] to cases where the defendant's conduct was privileged," and clarifies that "[a] necessary prerequisite to the maintenance of an action for tortious interference with contract is a defendant's intentional and unjustified inducement of a breach of contract." *Ill. Bell Tel. Co. v. Plote, Inc.*, 778 N.E. 2d 1203, 1211 (Ill. App. 2002) (internal quotation and citations omitted). If a defendant claims privilege, then the burden shifts to plaintiff to prove that the defendant's "conduct was malicious or unjustified." *Id.* (citation omitted).

Indeed, the DUA attached to the Amended Complaint confirms that Google did not intentionally induce the University to breach any contractual obligation. Critically, the DUA includes a representation from the University that it had "the right to disclose" the research data provided to Google and was "in compliance with applicable laws and regulations in making the [research data] available . . . ." (AC Ex. 1 at § 2.2.) Google could not have intentionally induced the University to commit a breach when the DUA confirmed to Google that the University had the "the right to disclose" the data at issue. *See Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 797-99 (N.D. Ill. 2011) (no tortious interference claim where defendant encouraged individuals to recruit plaintiff's employees not knowing that the recruitment violated those individuals' non-solicitation agreement).

### 2. Plaintiff has not alleged a breach of any contract by the University.

In addition to Plaintiff's failure to allege interference that was "intentional," the intentional interference claim fails for the additional and fundamental reason that the Amended Complaint does not adequately allege any breach by the University in the first place. The Opposition claims the University breached its contractual obligations to patients by (1) violating HIPAA in breach of a promise in the Admission and Outpatient Agreement and Authorization ("Agreement") to comply with "federal [] law," (2) violating the Illinois MPRA in breach of a promise in the Agreement to comply with "state law," (3) violating the Agreement's "all efforts" clause, and (4) selling patient information in violation of the Notice of Privacy Practices ("NPP"). (Opp. at 11.) All of these theories fail.

#### a. Plaintiff has not alleged any HIPAA violation.

With respect to Plaintiff's central theory of breach—that the transfer of research data without express patient authorization violated HIPAA—Google showed in its Motion that HIPAA in fact authorizes such transfers in multiple statutory safe harbors. The Opposition does

6.

not dispute these HIPAA provisions but asks the Court to ignore them for two meritless reasons.

*First*, Plaintiff argues that "Defendants would ultimately need to establish" various specific requirements "in order to take advantage of" the safe harbors. (Opp. at 17.) But it is *Plaintiff's* burden to plead facts that demonstrate an alleged HIPAA violation. Defendants do not have to prove that the safe harbors apply (even though Defendants' compliance is clear from Plaintiff's own allegations and the judicially noticeable materials presented to the Court)[3]. The very fact that HIPAA allows research data to be disclosed without patient authorization means Plaintiff cannot demonstrate a violation by simply alleging that he did not authorize the disclosure of the data at issue. As the Supreme Court explained in *Bell Atlantic Corp. v Twombly*, 550 U.S. 544, 545-46 (2007), facts that are "merely consistent with" an alleged violation do not satisfy Rule 8's pleading requirements. In *Twombly*, the plaintiffs' complaint included a Sherman Act price-fixing claim supported by specific allegations about the defendants' parallel pricing behavior over time. *Id*. The Supreme Court held these allegations were inadequate to state a claim because the alleged conduct "could just as well be" normal market behavior. *Id.* at 555-57, 565-68. Similarly here, merely alleging that patients did not authorize the disclosure of research data does not demonstrate any HIPAA violation because the disclosure "could just as well be" authorized by HIPAA's safe harbors. *Id.* at 557; *see also Spector v. Mondelez Int'l, Inc.*, 178 F. Supp. 3d 657, 670-71 (N.D. Ill. 2016) (Rule 8 requires "more than a sheer possibility that a defendant has acted unlawfully. . . . If the allegations give rise to an obvious alternative explanation, then the complaint may stop short of the line between possibility and plausibility") (internal quotation and citations omitted). This is especially true where a plaintiff pleads facts tending to support that "alternative explanation," as Plaintiff has

---

[3] *See* Mot. at 7; AC ¶ 66, Ex. 1 (Data Use Agreement); ECF No. 47-1 (Ex. A to the Somvichian Declaration iso Google's Mot. to Dismiss).

done here. (AC ¶ 66 (conceding that "[t]he information transfer was made pursuant to an 'Data Use Agreement.'").) *See also McCready v. eBay, Inc.*, 453 F.3d 882, 888 (7th Cir. 2006) ("[I]f a plaintiff pleads facts which show he has no claim, then he has pled himself out of court.") (citations omitted).

*Second*, Plaintiff conceded that HIPAA allows disclosure of Protected Health Information ("PHI") for research purposes without patient consent, but argues that the research project falls outside of the HIPAA safe harbors discussed in Google's Motion because it involved not only the disclosure of patient information but a "sale" requiring express patient authorization. (Opp. at 17-18.) Specifically, Plaintiff claims there was a "sale" because the University received "remuneration . . . in the form of a perpetual license to use software generated by Google . . . ." (*Id.* at 3, 17-18 (referencing 45 C.F.R. § 164.502(a)(5)(ii)).)[4] The DUA, however, shows otherwise. Google did not give the University a "perpetual license to use [Google] software." Rather, the University was granted a "license to use the *Trained Models and Predictions* that [Google] provides UChicago under this DUA for *internal non-commercial research purposes*." (AC Ex. 1 at § 3.12) (emphasis added.) This provision allows the University to share in the medical advancements that Google develops from the research data (the "Trained Models" and "Predictions") so long as the information is used for the University's own "internal non-commercial research purposes." This "license" simply confirms the primary purpose of the parties' relationship—the mutual exchange of research information—and is not "remuneration" within the meaning of HIPAA. Indeed, the DUA clarifies that the research data "remain[s] the sole property of UChicago [the University]" and the University retains the right to have the data returned or destroyed by Google, at the University's election, underscoring the parties' intent to

---

[4] Plaintiff does not allege that Google paid any money for the research data because any such allegation of a "sale" would be patently false.

8.

form a research relationship, not engage in a data sale. (AC Ex. 1 at §§ 3.10, 5.4.)

### b. Plaintiff has not alleged a violation of the MPRA.

There is no violation of the MPRA here because the MPRA's consent requirements apply only to patients who are active participants in "experimental procedures" or "research program[s]."[5] The definition of a "research program" makes this clear:

> Research program − any organized activity intended to establish new medical or scientific information, involving medical, surgical, manipulative, or psychiatric diagnosis or treatment of human subjects *who are inpatients or outpatients of a hospital and who are subjects at risk*.

77 Ill. Admin Code § 250.130(b)(1)(B) (emphasis added). Plaintiff seizes on isolated terms like "organized" and "new medical information" to claim that Google's data analysis falls within this definition, but by its plain language this section does not apply. Plaintiff does not allege that Defendants conducted research on him while he was an "inpatient[ ] or outpatient[ ] of a hospital," nor could he, as Google performed only data analysis of medical records. Plaintiff also does not come within the definition of a "subject at risk" because Google's data analysis did not subject him to any risk of any physical or other harm. Plaintiff claims the purported "invasion of privacy" from the University's disclosure of research data itself constitutes the necessary "risk," but this interpretation does not comport with the statutory language. Notably, Plaintiff quotes only part of the definition of a "subject at risk" in his Opposition (Opp. at 19), omitting the requirement that a "subject at risk" be put at risk for injury by "research, development, or related activity that significantly departs from the application of those established and accepted methods necessary to meet his or her needs, or that increases the ordinary risks of daily life, including the recognized risks inherent in a chosen occupation or

---

[5] Plaintiff does not argue that the research here constitutes an "experimental procedure" as that term is defined. (Opp. at 18.)

9.

field of service." 77 Ill. Admin Code § 250.130(b)(1)(C) (citation omitted). This definition is clearly inapplicable to Plaintiff and further underscores that "research program" refers to research involving current patients, not data analysis on depersonalized electronic health records as alleged in the Amended Complaint.[6]

### c. Plaintiff has not alleged a breach of the "all efforts" clause.

Plaintiff's Opposition also fails to show how the "all efforts" clause in the Agreement could contractually bar the University from sharing the research data at issue.

*First*, Plaintiff ignores the fact that immediately preceding the "all efforts" clause, the Agreement requires patients to agree that:

> [M]y medical information in any form . . . ***may be used and shared for research*** that has been approved by the University of Chicago Institutional Review Board (IRB) and that has been found to pose a minimal risk [and]
>
> I acknowledge that such research by the University of Chicago Medical Center may have commercial value and, in that event, I understand that I will not be entitled to any compensation, regardless of the value of such research or any products or inventions developed therefrom.

(AC Ex. 2 (emphasis added).) Plaintiff's interpretation of the "all efforts" clause would forbid the University from doing exactly what patients agree the University can do in the prior sentence, making the Agreement internally inconsistent and violating basic tenets of contract interpretation. *See Hammarquist v. United Cont'l Holdings, Inc.*, 809 F.3d 946, 951 (7th Cir. 2016) ("[defendant] cannot be said to have breached a contract by doing exactly what the contract authorized"); *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011) ("A contract must be construed as a whole, viewing each provision in light of the other provisions. The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions

---

[6] As further evidence that the "research program" requirements apply to current patients, the same section the University allegedly violated by transferring the data also states that "[n]o physician may conduct any research program . . . on a patient without the prior informed consent of the patient," and "[t]his Section shall not apply to any research program . . . for patients subject to a life-threatening emergency[.]" 410 ILCS 50/3.1(b), (c) (1997).

of the contract."). Plaintiff makes no effort to address this fundamental flaw of his theory.

*Second*, in response to Defendants' arguments that the term "all efforts" is too vague to be enforceable, Plaintiff argues that Illinois courts have enforced analogous "best efforts" clauses as a general agreement to act in good faith. (Opp. at 15-16); *see also M.S. Distrib. Co. v. Web Records, Inc.*, No. 00-cv-1436, 2003 WL 21087961, at *9 (N.D. Ill. May 13, 2003) ("the case law in Illinois generally holds that a best efforts undertaking is similar to the exercise of good faith implied in all contracts") (internal quotation and citations omitted). But again, even if the "all efforts" clause here imposes a general "good faith" requirement, it would not preclude the sharing of research data that patients specifically authorize in the immediate preceding term of the Agreement. *See, e.g., Alberto–Culver Co. v. Aon Corp.*, 812 N.E.2d 369, 380 (Ill. App. 2004) ("Where an inconsistency arises between a clause that is general and one that is more specific, the latter prevails.") (citations omitted).

          **d.**    **Plaintiff has not alleged a "sale" of his medical information in violation of the NPP.**

Plaintiff's final theory of breach is that the University "sold" Plaintiff's medical information to Google without obtaining written permission as required by the NPP. (Opp. at 11, 16-17.) As described above (*see* section (II)(B)(2)(a), *supra*), there was no "sale" of medical information to Google. To the contrary, the University disclosed, and patients agreed, that the University could share patient information as part of IRB-approved research, including research to develop products with commercial value (the only possible avenue by which the Amended Complaint could possibly be construed to allege a "sale") as discussed above. (*See* AC Ex. 2.)

    **C.**    **The Court Should Reject Plaintiff's Request To Create A New Tort Claim That Does Not Exist Under Illinois Law.**

          **1.**    **Seventh Circuit law precludes federal courts from creating new state law claims.**

In an eleventh-hour attempt to salvage a claim, Plaintiff abandons his cause of action for intrusion upon seclusion and asks this Court to adopt a new theory of liability that he concedes does not exist in Illinois. (Opp. at 24.) This Court should not create new state law. As the

11.

Seventh Circuit has repeatedly admonished, "in applying state law, federal courts are to be conservative, not innovative," and "[r]espect for state courts as the primary expositors of state law counsels restraint by federal court in announcing new state law principles." *Cima v. WellPoint Health Networks, Inc.*, 556 F. Supp. 2d 901, 906-07 (S.D. Ill. 2008) (internal quotation and citations omitted). Indeed, the Seventh Circuit has "consistently . . . held that it is not [the federal courts'] role to break new ground in state law." *Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 597 (7th Cir. 2017) (internal quotation and citation omitted); *see also Robinson v. McNeil Consumer Healthcare*, 671 F. Supp. 2d 975, 991 (N.D. Ill. 2009), *aff'd* 615 F.3d 861, 862 (7th Cir. 2010) (federal courts "must be careful to avoid the temptation to impose upon a state what it, or other jurisdictions, might consider to be wise policy").

Plaintiff cites two cases in asking the Court to adopt his new theory (Opp. at 24-25), but neither suggests that a federal court can create entirely new state law torts from whole cloth, as Plaintiff urges. Instead, the court in both cases applied established doctrines to new factual circumstances and had to predict how the state's high court would resolve that application of *existing* law. *See Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 644 (7th Cir. 2002) (applying the existing state law rule regarding the use of parol evidence where a contract includes an integration clause to the context of a fraud claim); *Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803, 811-12 (7th Cir. 2018) (barring card-holders' banks from collecting in tort against a retail merchant who suffered a data breach based on the economic loss rule already recognized in the relevant jurisdictions). Plaintiff has not provided any authority to support the extraordinary step of creating an entirely novel basis for liability under Illinois law, and this Court should decline to do so.

        2.        **Plaintiff's new legal theory fails on the merits even if it were available under Illinois law.**

Even if Plaintiff's new theory were recognized in Illinois, it does not apply here for three reasons. *First*, in every case Plaintiff cites where a court recognized a claim for a breach of a physician's duty of confidentiality, the wrongfully disclosed medical information directly revealed the plaintiffs' identities. *See, e.g., Lawson v. Halpern-Reiss*, 212 A.3d 1213, 1215 (Vt. 2019) (emergency room nurse disclosed to a police officer that Plaintiff, whom she had just treated for an injury, was intoxicated and had driven herself to the hospital); *Byrne v. Avery Ctr. for Obstetrics & Gynecology, P.C.*, 175 A.3d 1, 2-3 (Conn. 2018) (health care provider mailed a copy of plaintiff's medical records to the court where plaintiff's former partner had filed a paternity action); *Biddle v. Warren Gen. Hosp.*, 715 N.E.2d 518, 526-27 (Ohio 1999) (hospital disclosed unredacted medical forms with patient names and medical information to a law firm to enable the firm to contact the patients); *Alberts v. Devine*, 479 N.E.2d 113, 116 (Mass. 1985) (minister's superiors induced psychiatrist to share confidential information about the minister's mental health, which led to minister losing his position). The disclosure of patients' identities in connection with their medical information was crucial in each of these cases.[7] In contrast, and as detailed in Google's Motion, the information the University shared here had all direct identifiers removed—it was not *about* Plaintiff at all. (Mot. at 12; *see also* AC ¶¶ 64-65.) Thus, Plaintiff's repackaged claim suffers from the same fundamental defect: the common law does not recognize a cause of action for sharing data that does not identify, and is not tied to, specific individuals.

*Second*, as Plaintiff's own cases show, states adopting a claim for breach of a physician's

---

[7] Indeed, the cases make clear that the tort is intended to encourage trust and transparency between the patient and physician in order to promote better patient care. *See, e.g., Byrne*, 175 A.3d at 7 ("The purpose . . . is to give the patient an incentive to make full disclosure to a physician in order to obtain effective treatment . . .") (internal quotation and citations omitted). Courts adopting the tort wanted to protect against the "promiscuous[] disclos[ure]" of patient information and prevent physicians from "gossip[ing] about a patient's health." *Id.* at 13 (internal quotation and citations omitted). Where a patient's identity is not disclosed with his or her medical information, these concerns do not apply. (*See* Mot. at 2-3.)

duty of confidentiality have relied on HIPAA "to inform the standard of care applicable to such claims[.]" *Byrne*, 175 A.3d at 11 (internal quotation and citation omitted); *see also Lawson*, 212 A.3d at 1221 ("Given the Legislature's reliance on HIPAA, and medical care providers' familiarity with the law, we conclude that the federal statute and its implementing regulations should inform the standard of care and establish the framework for exceptions to medical care providers' duty of confidentiality.") (citation omitted). Thus, if a health care provider shares patient data in compliance with HIPAA (*e.g.*, pursuant to a DUA or IRB approval), there is no breach of the duty of confidentiality, even where that cause of action is recognized under state law. That is precisely what happened here. (*See* Mot. at 6-8.)

*Third*, even if the facts supported a breach of confidentiality theory as against the University (which they do not), and even if Illinois law recognized such a theory (which it has not), there would still be no basis to impose liability on *Google*. Plaintiff relies on the doctrine of in-concert liability, but it does not apply on its face. In-concert liability provides that a tortfeasor may be liable for the tortious conduct of another in three circumstances, two of which Plaintiff relies on here: (a) if he "*does* a tortious act in concert with the other . . ." or (b) if he "*knows* that the other's conduct constitutes a breach of duty and gives *substantial assistance or encouragement* . . . ." *Hutchinson v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1025 (7th Cir. 2018) (internal quotation and citations omitted) (emphasis added).

Theory (a) for in-concert liability does not apply here because it requires that a defendant "*actively participate* in the tortious conduct." *Hutchinson*, 910 F.3d at 1025. (emphasis added). The allegedly tortious conduct here is the University's *disclosure* of data. Google did not "actively participate" in that disclosure, nor could it; Google merely *received* the research data the University shared.

14.

Theory (b) also does not apply because it requires that a defendant offer "substantial assistance or encouragement" to an underlying tort with knowledge that it will result in a breach of duty. *See Hutchinson*, 910 F.3d at 1025; *Sanke v. Bechina*, 576 N.E.2d 1212, 1215 (Ill. App. 1991) (relying on the Restatement to illustrate substantial encouragement as follows: "A and B participate in a riot in which B, although not throwing rocks himself, encourages A to throw rocks. One of the rocks strikes C, a bystander. B is subject to liability to C.") Here, Plaintiff alleges no facts to show that Google knowingly encouraged the University to breach an obligation of patient confidentiality. To the contrary, Google received the research data pursuant to the DUA in which the University represented that it had the right to disclose the data at issue. The facts alleged in the Amended Complaint simply do not support a finding of in-concert liability, and Plaintiff's claim should be dismissed.

### D. Plaintiff's Claim for Unjust Enrichment Fails (Count 6).

Plaintiff's Opposition largely ignores his unjust enrichment claim, referring to it only in a single footnote. (*See* Opp. at 10 n.3.) As Google argued in its Motion, and as the Opposition appears to concede, his unjust enrichment claim depends on the success of his underlying claims. (*Id.*) Because each of the claims against Google fail, there is no basis for Plaintiff's unjust enrichment claim and it should be dismissed.

### III. CONCLUSION

For the reasons stated herein and in Google's Motion, Google respectfully requests that the Court dismiss Plaintiff's Amended Complaint with prejudice.

Dated: January 13, 2020

Respectfully submitted,

/s/ Michael G. Rhodes
Michael G. Rhodes

One of the Attorneys for Defendant
GOOGLE LLC

15.

**COOLEY LLP**
Michael G. Rhodes (Admitted Pro Hac Vice)
rhodesmg@cooley.com
Whitty Somvichian (Admitted Pro Hac Vice)
wsomvichian@cooley.com
Kristine A. Forderer (Admitted Pro Hac Vice)
kforderer@cooley.com
Audrey Mott-Smith (Admitted Pro Hac Vice)
amottsmith@cooley.com
101 California Street, 5th Floor
San Francisco, CA  94111-5800
Telephone:     (415) 693-2000
Facsimile:      (415) 693-2222

**NEAL & MCDEVITT**
Jeffrey Norberg (IL Bar No. 6315012)
jnorberg@nealmcdevitt.com
1776 Ash Street
Northfield, IL  60093
Telephone:     (847) 881-2468

**CERTIFICATE OF SERVICE**

I, Michael G. Rhodes, an attorney, certify that the foregoing **Memorandum of Points and Authorities in Reply in Support of Motion to Dismiss Plaintiff's Amended Complaint** was filed through the Court's CM/ECF system on January 13, 2020 which automatically provides notification of such filing to all registered users.

*/s/ Michael G. Rhodes*
Michael G. Rhodes

218220628

17.